**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

_____

| | |
|---|---|
| **MEENA JAIN, M.D.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **No. 08-2119-STA-dkv** |
| ) | |
| **MEMPHIS SHELBY COUNTY** ) | |
| **AIRPORT AUTHORITY and** ) | |
| **SERVICE MANAGEMENT** ) | |
| **SYSTEMS, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

_____

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
_____

Before the Court is Plaintiff's Motion for Summary Judgment (D.E. # 51) filed on November 16, 2009. Plaintiff has filed a Response in opposition to the Motion, and Defendants have submitted a Reply brief. The Court conducted a hearing on Plaintiff's Motion on February 16, 2010. For the reasons set forth below, the Motion is **DENIED**.

**BACKGROUND**

The following facts are not in dispute for purposes of this Motion unless otherwise noted:[1] on September 11, 2007, Plaintiff was traveling via Northwest Airlines from Columbus,

---

[1] Defendants have submitted a memorandum in support of their Motion totaling twenty-one (21) pages. Local Rule 7.2 (e) states, "Memoranda in support of or in opposition to motions shall not exceed twenty pages without prior court approval, including the statement of facts." Furthermore, Defendants have failed to comply with Local Rule 7.2(d)(2), which states "the proponent of the motion shall submit in a separate document affixed to the memorandum each material fact upon which the proponent relies in support of the motion by serial numbering." Here Defendants' Statement of Facts is not properly numbered.

Ohio, to Tampa, Florida, which included a connecting flight through Memphis, Tennessee. Statement of Undisputed Facts ¶ 1.  When Plaintiff arrived at Memphis International Airport ("the airport"), she had missed her connecting flight to Tampa, Florida. *Id*. ¶ 2.  Plaintiff deboarded her flight from Ohio carrying a purse and went to Gate B35 of Concourse B for additional information about the next flight to Tampa, which was to depart from Gate B6. *Id*. ¶ 3.  When Plaintiff left Gate B35, traffic in the terminal was average and not very busy. *Id*. ¶ 4.  Prior to Plaintiff's fall, there were people in front of her, but she did not feel crowded as she proceeded, nor was she unable to walk without running into someone in front of her. *Id*. ¶ 5.  Plaintiff's path was open with nothing to prevent her from seeing the ice cream on the floor before she slipped in it. *Id*. ¶ 6.

In the vicinity of Gate B29, Plaintiff slipped and suddenly fell down in an ice cream spill on the floor of the Walkway in Terminal B. *Id*. ¶ 7.  After she fell and while still on the floor, Plaintiff observed that her left foot developed a hematoma and swelling. *Id*. ¶ 8.  Plaintiff observed light brownish-colored ice cream on the right side of her jeans up to her knee and the right side of her foot. *Id*. ¶ 9.  The color of the ice cream looked very similar to the color of the floor itself. *Id*.  Plaintiff estimated the pool of ice cream to be about two (2) feet in diameter. *Id*. ¶ 10.  Plaintiff did not see an ice cream cone on the floor. *Id*. ¶ 11.  Plaintiff does not know how the ice cream came to be on the floor. *Id*. ¶ 12.  Plaintiff does not know whether the ice cream spill was created or put on the floor because of something the airport or its representatives did.

---

Plaintiff has submitted a proper response to Defendant's Statement of Facts and even numbered each statement as required by Local Rule.  However, Plaintiff has included a Statement of Additional Facts, which is not permitted under Local Rules.  The Court will, therefore, not consider the additional facts.

*Id.* ¶ 13.  Plaintiff is uncertain about the exact time that she fell.  *Id.* ¶ 14.  Plaintiff does not know how long the ice cream had been on the floor prior to the time she slipped in it.  *Id.* ¶ 15.  Plaintiff cannot state how long the ice cream had been on the floor based on her observations of the appearance of the ice cream after falling in it, aside only from mere speculation.  *Id.* ¶ 16.

Within seconds of the accident, other travelers gathered around Plaintiff to offer help.  *Id.* ¶ 17.  The travelers who came to Plaintiff's aid called around and looked for someone to come and help.  *Id.* ¶ 18.  A Spanish-speaking traveler hailed another person who retrieved a wheelchair.  *Id.* ¶ 19.  A man who "looked like somebody who moves a wheelchair" or a "porter in some kind of uniform" brought the wheelchair for Plaintiff and assisted her into it.  *Id.* ¶ 20.  Approximately five (5) minutes elapsed between Plaintiff's fall and the arrival of the male in uniform with the wheelchair.  *Id.* ¶ 21.[2]

"During all this commotion," "on the corner of [Plaintiff's] eye," and "for a flicker of a second," Plaintiff looked to her right side and saw a lady who had "like a mop thing on her" or "some cleaning thing she was holding or something."  *Id.* ¶ 22.  This female appeared to be about twenty-five (25) steps away from Plaintiff at the time.  *Id.* ¶ 23.  The female was looking at Plaintiff, and their eyes met.  *Id.* ¶ 24.  Plaintiff had the "impression" that this female was a cleaning lady, but Plaintiff testified in her deposition that "maybe she was just curious and looking at me."  *Id.*  Plaintiff does not know this for certain.  *Id.*  Plaintiff adds that the woman appeared to be wearing a uniform which was unlike the uniforms worn by airline employees.  Plaintiff does not know whether the female she observed twenty-five steps away from her

---

[2] The Court finds Plaintiff's dispute over the phrasing of this Statement to be without merit.

3

holding a cleaning device was coming to clean the ice cream. *Id*. ¶ 25. Plaintiff "thinks" that the female worked for the airport because she observed the female wearing "some kind of uniform." *Id*. ¶ 26. Plaintiff does not know the color of the woman's uniform except that it was "a little bit darkish." *Id*. Again Plaintiff adds that the woman's uniform was distinct from the uniforms worn by airline employees. At the time Plaintiff saw this unidentified female, Plaintiff was already sitting in the wheelchair or was in "the process of being picked up, put in the wheelchair." *Id*. ¶ 27. Plaintiff believes "maybe they were lifting [her] up" when she saw the female. *Id*.

Plaintiff does not know whether the airport or its representatives knew that the ice cream spill was present on the floor before she fell. *Id*. ¶ 28. Plaintiff admits that she does not have personal knowledge but that other evidence such as the destroyed video recording of the slip and fall tends to show that Defendants did know about the ice cream spill before her accident. Plaintiff was in the area of her fall for a total of ten (10) to twelve (12) minutes after it occurred. *Id*. ¶ 29. During the entire time she was at the scene, Plaintiff never saw anyone clean up the ice cream. *Id*. Plaintiff responds that there is a factual dispute between her own testimony and the testimony of Carey Jones, an eyewitness to the events, on this point.

The male who brought Plaintiff a wheelchair ultimately took her to her Gate B6 where she boarded her connecting flight. *Id*. ¶ 30. The airport police did not arrive while Plaintiff was present at the scene of her fall in the vicinity of Gate B29. *Id*. ¶ 31. A police officer talked to Plaintiff for the first time after she was on the jet-way at Gate B6 about to board her departing flight. *Id*. ¶ 32. At the same time, paramedics/EMS arrived to treat Plaintiff while Plaintiff was on the jetway of her departing flight at Gate B6. *Id*. ¶ 33. Plaintiff signed the EMS report which

4

indicated that paramedics arrived to meet Plaintiff at Gate B6 at 2:15 p.m. on the date of the incident. *Id*. ¶ 34. The following day after Plaintiff had returned to Florida, she called the airport police department. *Id*. ¶ 35.

Cary Lee Jones ("Jones") is a resident of Conoga Park, California. *Id*. ¶ 36. Jones has resided in the Los Angeles area for seven and one-half (7 ½) years. *Id*. On or about September 11, 2007, Jones was on vacation and traveled from LAX Airport to Fort Walton Beach, Florida, to visit her grandmother for three (3) days. *Id*. ¶ 37. Her itinerary included a layover at the airport in Memphis, Tennessee. *Id*. Jones de-boarded her arriving flight in Memphis and thereafter went to the gate where her connecting flight was to leave. *Id*. ¶ 38. After she arrived at her departing gate, Jones leaned against a pillar and placed a telephone call from her cell phone to her mother in Washington, D.C. *Id*. While talking on the phone with her mother, Jones observed a man pushing a toddler in a stroller some ten (10) to twelve (12) feet from where she was standing and then observed either the man or the toddler drop ice cream onto the walkway in front of her. *Id*. ¶ 39. The man with the toddler kept walking. *Id*.

When Jones saw the ice cream spill, she thought it needed to be cleaned up and looked around for someone to assist with the spill. *Id*. ¶ 40. Jones did not observe anyone that she believed to be a janitor, representative, stewardess, or person in the area who could have taken care of the spill. *Id*. A "brief" amount of time, within one (1) minute, after Jones observed the ice cream spill, Jones saw a non-Caucasian female with dark hair, possibly of Indian descent, slide into the ice cream and fall. *Id*. ¶ 41. Jones is certain that less than a minute elapsed between the time she saw the ice cream dropped onto the floor and the time she saw the female come along and slip. *Id*. ¶ 42. In response to this statement, Plaintiff cites Jones's vague

5

responses about the amount of time that elapsed and points out that Jones could not remember Plaintiff's actual ethnicity. Jones also admitted during her deposition that her memory of the event had faded in the intervening time. At the time the female fell on the floor in front of her, Jones did not see any individual in the area whom she believed to be airport personnel. *Id.* ¶ 43. The period of time between the occurrence of the ice cream spill and the fall by the female in front of her was brief enough that Jones "would have gone up and told somebody that. . . they need to call a janitor" and "wouldn't have just left it there." *Id.* ¶ 44. Plaintiff disputes this statement by adding that Jones could not say definitively whether cleaning staff was within fifteen or more feet of the area. Given the brief amount of time that passed between the time Jones saw the ice cream dropped onto the floor until the time she observed the lady fall in the ice cream, she would not have had time to find an individual to notify them about the spill in order to have prevented the fall from occurring. *Id.* ¶ 45. Plaintiff argues that Jones actually testified that it "would have been very close."

Jones observed that the female was carrying a purse and that her belongings and personal effects went flying from the handbag and spilled onto the floor. *Id.* ¶ 46. Jones approached the fallen female and helped to pick up her belongings from the floor. *Id.* ¶ 47. Jones observed that the woman immediately had visible swelling in her ankle. *Id.* ¶ 48. Several people came to the scene and asked the woman if she was okay. *Id.* ¶ 49. Jones observed someone bring a wheelchair, and the fallen female was helped into a seat because she could not stand. *Id.* ¶ 50. Plaintiff contends that Jones actually testified that she could not remember whether a wheelchair was provided. *Id.* ¶ 51. Less than fifteen (15) minutes elapsed from the time Jones observed the female fall until the time the female left the scene. *Id.*

Subsequently, Jones spoke to a male in a uniform at the scene and gave him her name and cell phone number, telling him what she had witnessed. *Id*. ¶ 52. Jones also saw a man wearing a "custodial uniform" and pushing a cleaning cart come to the area and clean up the spill. *Id*. ¶ 53. Jones did not notice the male with the cleaning cart anywhere in the area prior to his arriving at the scene to clean up the ice cream spill. *Id*. ¶ 54. Plaintiff again objects that Jones could not definitively state that there were no custodial employees in the vicinity of the spill. Jones testified that the cart being pushed by the man who cleaned the spill was large enough that Jones would have noticed him had he been present in the area when the ice cream spill occurred. *Id*. ¶ 55.

James Earl McClain ("McClain") is a former employee of Defendant Service Management Systems, Inc. ("SMS"). *Id*. ¶ 56. McClain worked for SMS as a cleaning person on September 11, 2007, and was assigned to Concourse B. *Id*. Like other SMS employees, McClain's uniform consisted of black pants and a light grey short sleeve shirt bearing an "SMS" emblem on the shoulder. *Id*. On the day of Plaintiff's slip and fall, McClain was cleaning a bathroom at Gate B29 when a Northwest Airlines employee came into the bathroom and told him there had been an ice cream spill on the floor at B27. *Id*. ¶ 57. The Northwest employee told McClain that he had placed a garbage can in front of the spill on the floor. *Id*. In response to the Northwest employee, McClain asked whether the spill had already been announced, and the Northwest employee responded that it had not. *Id*. When McClain left the bathroom, there was no one else waiting outside to clean the spill up. *Id*. ¶ 58. According to Plaintiff, the accident report McClain completed for SMS contradicts his deposition testimony in so far as the report does not mention the Northwest employee or the garbage can being placed in front of the

spill. Rather McClain's report stated that he just came upon the ice cream.

McClain went to the area of the spill and determined that it consisted of melted or melting ice cream about two feet in diameter, a main portion and some splatter. *Id*. ¶ 59. After McClain had finished cleaning up the ice cream spill, he heard a broadcast over the airport intercom system about the spill on the floor. *Id*. ¶ 60. At the request of his supervisor Myra Housley ("Housley"), McClain completed a written report of the incident the next day. *Id*. ¶ 61. McClain's wife, Emma McClain ("Mrs. McClain"), who also worked for SMS, completed the narrative portion of the report for her husband, and McClain signed the report after looking over it. *Id*. ¶ 62. Plaintiff objects that McClain's wife actually completed the report and McClain only signed it. McClain reported that a call came in over the airport intercom system "around 2:00 p.m." on September 11, 2007, announcing a spill. *Id*. ¶ 63. In response to this statement, Plaintiff states that the first page of the report was actually completed by Housley, not McClain nor Mrs. McClain. Furthermore, the report contradicts McClain's deposition testimony and contains the wrong date and time of the accident. Plaintiff adds that Housley was disciplined by her supervisor for submitting the report the day after the accident.

McClain has no knowledge about how the ice cream came to be on the floor. *Id*. ¶ 64. McClain did not know how long the ice cream had been there; he had the impression it that it had occurred right before the Northwest employee came and got him. *Id*. ¶ 65. Plaintiff reiterates her contention that this statement is at odds with McClain's written incident report.

Per SMS procedures, SMS employees performed their cleaning and inspection duties by starting at one end of Concourse B and working their way down to the opposite end, cleaning each of the Concourse's four (4) bathrooms located at Gates B27, B29, B32, and B36. *Id*. ¶ 66.

McClain completed SMS forms known as a restroom cleaning logs ("the logs") where he would note the time he completed cleaning each bathroom. *Id.* ¶ 67. On the logs for the week of September 8 through 15, 2007, September 11, 2007 fell in the column under Tuesday. *Id.* According to his log on the date of the incident, McClain completed cleaning of the men's room near Gate B27 at 1:20 p.m.; the B29 men's room at 1:40 p.m.; the B32 men's room at 2:00 p.m.; and the B36 men's room at 2:25 p.m. *Id.* ¶ 68.

When McClain finished the men's room at B27 at 1:20 p.m., he walked toward the B29 men's room, passing by the area where the ice cream spill ultimately occurred. *Id.* ¶ 69. There was no ice cream on the floor at that time. *Id.* McClain finished cleaning the B29 men's room at 1:40 p.m. *Id.* Plaintiff objects that McClain testified that he did not see a spill, not that there was no spill. Based on McClain's logs, the spill occurred after McClain went into the restroom at B29, because after he finished that men's room, he went to the men's restroom at B32. *Id.* ¶ 70. Plaintiff adds that McClain also stated that he could have been cleaning the water fountain adjacent to the B29 men's room when he was told that there was a spill.

McClain was trained on how to clean up debris or liquid on the floor of the concourse walkways. *Id.* ¶ 71. If McClain discovered liquid on the concourse, he was trained by SMS to put down wet floor signs surrounding the area and to get the liquid up quickly. *Id.* In McClain's experience, he was sometimes called to clean up a spill by an announcement over the airport intercom system and sometimes when airport workers would notify him about a spill. *Id.* ¶ 72.

Mrs. McClain was an employee of SMS from March 2007 until October 2008 as a housekeeper in the same capacity as her husband. *Id.* ¶ 73. Mrs. McClain assisted her husband in completing page two of the Incident Report about Plaintiff's fall of September 11, 2007. Mrs.

9

McClain wrote what McClain told her about the incident, page one of the report having already been completed by Housley, McClain's supervisor. *Id*. ¶ 74. According to the Incident Report, an unidentified "baggage guy" with Northwest Airlines initially told McClain about the spill. *Id*. ¶ 75. After McClain had cleaned it up, he heard a page over the intercom to clean up the spill. *Id*. ¶ 76. Plaintiff again argues that the report conflicts with McClain's deposition testimony.

Daniel Longstreth ("Longstreth") has been facility manager for Defendant SMS at the airport since February 2007. *Id*. ¶ 77. Longstreth implemented an interim agreement between SMS and MSCAA to provide janitorial services at the airport and that agreement was in effect at the time of Plaintiff's fall. *Id*. ¶ 77. Per its contract with MSCAA, SMS assigns employees to clean and patrol various areas of the airport. *Id*. ¶ 78. On September 11, 2007, McClain was assigned the four (4) men's rooms from B27 to B36 and the area where Plaintiff's fall occurred. *Id*. McClain was also responsible for maintaining a lookout in the concourse for anything that needed to be cleaned. *Id*. SMS's protocol for spills in the airport is to immediately clean them, using caution signs and the housekeeping cart as necessary to block off the area. *Id*. ¶ 79. SMS's contract with MSCAA requires SMS to clean the airport's restrooms nine (9) times every 24 hours and patrol five (5) times per day, or to clean and patrol a given area twice each shift. *Id*. ¶ 80.

SMS employees might receive notice of a spill during their regular patrols, by announcement over the intercom, or from radio calls from the Airport Communication Division via handheld radios used by some SMS supervisors. *Id*. ¶ 81. Plaintiff adds that McClain testified that SMS employees are also notified of spills by other persons in the Airport.

SMS utilizes a document called a supervisor's log daily for each shift to delegate work

and keep track of which employees are assigned to particular work that day, with restrooms assigned based on gender, if possible. *Id*. ¶ 82. The supervisor's log on September 11, 2007, listed all supervisors directly below Longstreth, his assistant manager, and the SMS employees working that date. *Id*. Together with Mary Moulton ("Moulton"), an SMS supervisor, and her trainee Isela Najera ("Najera"), McClain was assigned to the B36 side of Concourse B. *Id*. During his deposition, Longstreth reviewed the restroom cleaning log for September 11, 2007, and testified as to where SMS cleaning staff may have been at or near the time of Plaintiff's fall. *Id*. ¶ 84. According to Longstreth, McClain finished cleaning the B27 men's room at 1:20 p.m. and the B29 men's room at 1:40 p.m. *Id*. ¶ 85. From there McClain would have moved to the B32 men's room, which he finished cleaning at 2:00 p.m. *Id*. According to the logs, Najera also completed the ladies' room at B27 at 1:20 p.m. and at B29 at 1:20 p.m. *Id*. Najera then moved on to the ladies' room at B32 and left by 1:40 p.m. *Id*. Plaintiff argues that Longstreth interpreted the logs based on his own expectations for his employees and where they would be at a given time, not where they actually were. Longstreth also admitted that the logs, particularly those for women's restrooms, were not filled out properly and sometimes were difficult to read.

Myra Housely, denoted by the initials "MH" on the restroom cleaning logs, inspected the restrooms on Concourse B on the day of Plaintiff's fall. *Id*. ¶ 86. Housley inspected the B27 ladies' room at 1:45 p.m.; the B27 men's room at 1:51 p.m.; the B29 ladies' room at 1:55 p.m.; the men's room at B29 at 2:11 p.m.; and the men's room at B32 at 2:15 p.m. *Id*. Plaintiff emphasizes that this would place Housley in the vicinity of the area where Plaintiff fell and that Housley would match the description of the woman Plaintiff observed standing-by at the time of her fall.

11

In his capacity as facility manager for SMS at the airport since February 2007, Longstreth is not aware of any other instance of someone alleging to have slipped as a result of ice cream on the floor. *Id*. ¶ 87. Mr. Longstreth is not aware of any other lawsuits against SMS or the airport alleging a fall on Concourse B. *Id*.

All of MSCAA's maintenance department employees are trained to report spills or other occurrences that need to be remedied at the airport. *Id*. ¶ 88. Airlines and concessions vendors who operate at the airport have their own janitorial staff, but SMS was the only janitorial service provider for MSCAA. *Id*. ¶ 89. MSCAA expects any spill to be cleaned up as soon as it is reported or discovered. *Id*. ¶ 90.

When incidents such as slip and falls occur at the airport, MSCAA is generally notified by telephone calls into the Communications Center. *Id*. ¶ 91. This phone number is available for airport employees as well as airport tenants and passengers. *Id*. MSCAA Communications Division is responsible for communicating with airport personnel and emergency personnel in helping respond to incidents at the airport. *Id*. ¶ 92. If the recording system is operating properly, telephone calls into the Communication Center and by radio to police officers are recorded by a voice-activated recording system that is fed into a computer. *Id*. ¶ 93. A dispatcher from the Communications Center would then notify an MSCAA police officer via Motorola radio. *Id*. MSCAA Communications Division staff monitors the video cameras in the airport and has the ability to dispatch a police officer if something unusual is seen on the camera monitors. *Id*. ¶ 94.

MSCAA first received notice of Plaintiff's fall when it was reported to an MSCAA

police officer via radio, and this call was recorded at 1:50 p.m. on September 11, 2007. *Id.* ¶ 95.[3]
That call was placed by David Lee, an employee for Northwest/Delta Airlines, and it was received by MSCAA Communications Division employee John Carrico. *Id.* ¶ 96. Plaintiff disputes these assertions because she saw a woman in a uniform at the scene when she fell and because McClain testified that Housley was aware of the spill before he was notified. Prior to Lee's call, no one gave notice to MSCAA Communications of the ice cream spill near Gate B29. *Id.* ¶ 97. Plaintiff argues that questions about the date the CDs containing the recordings were actually created cast doubt on their authenticity.

An Officer Matthews prepared a police report about Plaintiff's fall noting that MSCAA was notified of the accident at 13:52. *Id.* ¶ 98. On September 12, 2007, the day after her accident, Plaintiff called the airport which led an Officer Stubbs to prepare a second police report. *Id.* ¶ 99.[4]

The Airport Communications Division received a call at 2:02 p.m. from Jetway Supervisor "Jim," a Northwest Airlines employee, who reported the name and telephone number of an eyewitness to the fall, later discovered to be Cary Jones. *Id.* ¶ 100. It would have been the normal practice for an MSCAA police officer to have included the names and numbers of any identified witnesses they were aware of, but neither police report noted any witness. *Id.* ¶ 101. Jones's information was not contained in either of the two police reports generated by Officer Stubbs or Officer Matthews. *Id.* ¶ 102.

---

[3] Defendants' Statement of Facts actually reads September 11, 2009. The Court assumes that this was a typographical error as it is undisputed that the accident occurred in 2007, not 2009.

[4] *See* note 3.

In the Motion before the Court, Defendants argue that Plaintiff cannot make out her prima facie case of negligence under a premises liability theory. More specifically, Plaintiff cannot show that Defendants created the dangerous condition or had actual or constructive notice of the ice cream spill prior to Plaintiff's fall. No SMS employee including McClain knew about the ice cream on the floor until after Plaintiff's fall or how the ice cream came to be there. McClain testified that he heard the intercom call to clean up the spill after he had already cleaned it. As for MSCAA, no calls were made to the Communication Center until the first report of Plaintiff's accident was made. Plaintiff herself testified that the porter who brought her the wheelchair took approximately five (5) minutes to reach her, and so Plaintiff cannot show that this employee was in the immediate area. Thus, neither Defendant had actual notice of the spill. Defendants further contend that Jones's eyewitness testimony establishes that Defendants could not have had constructive notice of the ice cream spill. Jones observed the ice cream spill onto the floor and then in a matter of moments Plaintiff came through and slipped on the ice cream. Based on the timing of SMS employees moving through the area and very short span of time Jones testified to, Defendants contend that Plaintiff cannot prove that they had notice of the dangerous condition on the floor.

Plaintiff has responded in opposition to Defendants' Motion. Plaintiff raises a number of issues including Defendants' spoliation of video purporting to capture the slip and fall as well as the late disclosure of Carey Jones's identity and her testimony as reasons that the Court should deny summary judgment. Plaintiff points to genuine issues of fact about whether Housley was in the vicinity of the spill prior to Plaintiff's fall and if so whether Housley had notice of the dangerous condition. Both Housley and McClain testified that they learned of the spill after the

other person already knew about it. McClain's own testimony seems to contradict his written incident report, which itself raises questions about credibility and authenticity. Plaintiff argues that should the Court grant an adverse inference instruction as a sanction for Defendants' spoliation of the video, then summary judgment would also be inappropriate. Finally, Plaintiff raises questions about the weight and reliability of the testimony of Carey Jones due to her admittedly faded memory of the events of September 11, 2007. Therefore, the Court should deny Defendants' Motion.

Plaintiff has filed a reply brief, which the Court has reviewed and considered here.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a

> judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.[5]

In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[6] When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[7] It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[8]

---

[5] Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[6] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[7] *Celotex*, 477 U.S. at 324.

[8] *Matsushita*, 475 U.S. at 586.

These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[9]  When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[10]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[11]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[12]  Finally, the "judge may not make credibility determinations or weigh the evidence."[13]  Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[14]

## ANALYSIS

The parties have briefed and are agreed on the elements Plaintiff must prove in order to make out her case of negligence under a premises liability theory.  It is undisputed that Plaintiff's slip and fall was caused by spilled ice cream on a concourse at Memphis International

---

[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[10] *Id.* at 251-52 (1989).

[11] *Celotex*, 477 U.S. at 322.

[12] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[13] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[14] Fed. R. Civ. P. 56(c); *see also Celotex*, 477 U.S. at 322 (1986).

Airport. The only contested issue is whether Defendants had notice, either actual or constructive, of the spilled ice cream. The Court holds that summary judgment would be inappropriate in this case. First, there are genuine issues of fact about whether SMS employees had notice of the spill prior to Plaintiff's slip and fall. As Plaintiff points out, the records shows that McClain, the man who eventually cleaned up the spill, has offered slightly different accounts of how he came to learn of the spill. The record further indicates that Housley, another SMS employee, was in the area of the spill right around the time of Plaintiff's slip and fall. Taking this evidence and the other facts cited by Plaintiff in a light most favorable to her, the Court finds that there exist genuine issues of material fact which can only be determined by a jury.

Secondly, the Court has granted Plaintiff's motion for sanctions for the spoliation of video recordings of the accident. Specifically, the Court will instruct the jury that it may infer from the loss of the evidence that the video would have been unfavorable to Defendants. Such an inference is "always rebuttable - the effect of the sanction is to shift the burden to the spoliator to disprove the negative inference."[15] Furthermore, an adverse inference necessarily impacts consideration of a motion for summary judgment, particularly where as here the inference is itself a question of fact.[16] Based on the fact that Defendants must now rebut the presumption that the video would have contained unfavorable evidence, the Court holds that

---

[15] *Darling v. J.B. Expedited Services, Inc.*, 2006 WL 2238913, at *11 (M.D. Tenn. Aug. 3, 2006)

[16] *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 603 (6th Cir. 2009) (remanding for consideration of applying spoliation sanction and consequently vacating entry of summary judgment) ("This may alter the merits of the summary-judgment analysis of the lead plaintiffs' [] claims.").

Defendants cannot demonstrate that there are no genuine issues of material fact. Therefore, Defendants' Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

                                              **s/ S. Thomas Anderson**
                                              S. THOMAS ANDERSON
                                              UNITED STATES DISTRICT JUDGE

Date:   February 24th, 2010.